**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MICHAEL MICHAELIS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:17-CV-01117-M (BH)** |
| | § | |
| **NANCY A. BERRYHILL, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.  Before the Court are *Plaintiff's Opening Brief*, filed October 13, 2017 (doc. 15), *Defendant's Response Brief*, filed November 13, 2017 (doc. 16), and *Plaintiff's Reply Brief*, filed December 4, 2017 (doc. 17).  Based on the relevant findings, evidence, and applicable law, the Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further administrative proceedings.

## I.  BACKGROUND[1]

### A.  Procedural History

Michael Michaelis (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act).  (doc. 15 at 5.)  On November 15, 2013, Plaintiff applied for DIB, alleging disability beginning on December 13, 2012.  (R. at 195.)  His claim was denied

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

on March 13, 2014, and upon reconsideration on June 3, 2014. (R. at 212-15, 218-20.) On June 16, 2014, he requested a hearing before an Administrative Law Judge (ALJ). (R. at 222-23.) He appeared and testified at a hearing on April 10, 2015. (R. at 142-82.) On February 3, 2016, the ALJ issued a decision finding that he was not disabled and denying his claim for benefits. (R. at 120-36.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on February 10, 2016. (R. at 94-96.) The Appeals Council denied his request for review on March 8, 2017, making the ALJ's decision the final decision of the Commissioner. (R. at 1-5.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**B.   Factual History**

**1.   Age, Education, and Work Experience**

Plaintiff was born on April 30, 1962, and was 52 years old at the time of the hearing before the ALJ. (R. at 134, 156.) He had at least a high school education and could communicate in English. (R. at 134.) He had past relevant work experience as an outside sales representative and networking sales representative. (R. at 134.)

**2.   Medical Evidence**

On October 21, 2008 and November 5, 2008, Plaintiff met with Roland Siegler, M.D., and reported a history of neck pain and muscle spasms. (R. at 486, 488.) Examinations showed Plaintiff had some straightening of the normal cervical lordosis as well as cervical spondylosis with disc space narrowing and osteophyte formation at C5-6. (R. at 486, 488.)

Between September 12, 2011 and November 12, 2013, Plaintiff received regular treatment at Tri City Psychiatric Services. (R. at 515-26.) He initially stated he drank a lot of alcohol, later stated he only drank on the weekends, and denied alcohol use during the final meetings. (*See* R. at

515-26.)  He did not appear to be medication compliant on multiple occasions.  (R. at 515-19, 521, 525.)

On December 5, 2012, an MRI of Plaintiff's cervical spine revealed multilevel cervical spondylosis with straightening of the expected degree of cervical lordotic curvature.  (R. at 447-48.) Areas of edema were present within the C2, C4, and C5 vertebral bodies, particularly to the right of the midline.  (R. at 447.)

On December 21, 2012, Plaintiff went to the Fort Worth Brain and Spine Institute (Institute) with neck pain.  (R. at 561-62.)  His x-ray and MRI showed curvature of his spine to the right, and a right-sided eccentric disc bulge at C4-5 that caused mild central canal and moderate neural foraminal stenosis. (R. at 562.)  Atif Haque, M.D., informed Plaintiff that these issues could explain his right shoulder and arm symptoms.  (R. at 563.)  Dr. Haque offered him surgery, and Plaintiff was scheduled to undergo a C4/C5 anterior cervical discectomy and fusion at Baylor All Saints Hospital (Baylor) on January 9, 2013.  (R. at 563.)

Upon referral from Dr. Haque, Plaintiff met with Charles Hughes, D.O., on December 21, 2012.  (R. at 465-66.)  Plaintiff reported that he suddenly developed right neck pain while boating in 2007; he denied any significant trauma or a major accident.  (R. at 465.)  Since 2007, he had struggled with chronic neck pain and had been previously diagnosed with cervical torticollis.  (*Id.*) The pain was excruciating; cervical facet blocks were not helpful, although pulling his neck to his left shoulder was beneficial, and tilting his head backwards relieved the muscle pull.  (*Id.*)  Dr. Hughes noted that Plaintiff had been diagnosed with bipolar disorder a few years prior but had stopped taking all of his psychiatric medications a few months ago because he could not afford them. (*Id.*)  He also noted that Plaintiff was extremely anxious and irritable, and reported that his chronic

pain took over his life. (*Id.*)  Plaintiff denied tobacco use but stated that he drank "as much alcohol as possible." (*Id.*)  Dr. Hughes diagnosed Plaintiff with very mild cervical dystonia with cervical torticollis. (R. at 466.)  Before he pursued treatment with Botox, however, he wanted Plaintiff to have better control over his bipolar symptoms and pain management medications because there was a high risk of heightened pain due to Plaintiff's uncontrolled bipolar disorder. (*Id.*)  Without it, Botox treatment would not be a long-term benefit. (*Id.*)

Plaintiff routinely received treatment from Ashley Classen, D.O., at Trinity Pain Medicine Associates (Trinity), for pain management from December 21, 2012, until June 9, 2014. (R. at 607-736.)  Dr. Classen continuously informed Plaintiff that there were multiple causes for his symptoms, and that he would require many different treatments, but it was possible his symptoms would not improve even with those treatments. (*See* R. at 607-736.)  Plaintiff understood that the goal was to isolate his pain generators, then perform more invasive procedures to give him a longer duration of pain relief. (*See* R. at 607-736.)  Plaintiff was regularly prescribed Oxycotin, and also received Botox and nerve block injections. (*See* R. at 610, 612, 615, 619, 622, 626-27, 634, 637-38, 642, 646, 669, 676, 709, 713, 717.)  The treatment was beneficial, and Plaintiff indicated he was in no pain on multiple occasions. (R. at 618, 620, 623, 626, 630, 640, 644, 648, 657, 663, 678, 682, 711, 719.)  Dr. Classen noted that Plaintiff was moderately obese in October 2013. (R. at 690.)  Throughout his visits at Trinity, Dr. Classen routinely noted that Plaintiff consumed alcohol on a regular basis. (R. at 606, 608, 612, 616, 620, 623, 630.)

On January 9, 2013, Plaintiff underwent a C4-5 anterior cervical discectomy and fusion surgery without complication. (R. at 423, 781-82.)  The following morning, he noted some improvement in his neck tightness and had no arm pain. (R. at 423.)  Overall, his pain was

controlled.  (*Id.*)  Upon discharge, Plaintiff reported his pain was 5/10 in the anterior neck, and was aggravated by movement, but was alleviated with rest and medication.  (R. at 432.)  He was discharged on January 10, 2013.  (*Id.*)

On January 25, 2013, Plaintiff had his first post-operation follow-up at the Institute.  (R. at 558-59.)  The pain on the right side of his neck was resolved but he still had pain on the left side.  (R. at 558.)  He thought he was holding his head straighter and felt like the surgery was a "miracle."  (*Id.*)  He continued to report that he was doing well and that he was happy with the surgery at subsequent follow-up appointments on March 1, 2013, April 5, 2013, July 12, 2013, and October 11, 2013.  (R. at 546, 549, 552, 555.)  He still reported some pain, however.  (R. at 549, 552, 558.)

On April 1, 2013, Plaintiff underwent a psychological evaluation with Charles A. Haskovec, Ph. D., to determine his suitability for a pain reduction procedure.  (R. at 787-99.)  He was oriented to person, place, and time, dysphoric, without suicidal or homicidal ideations, and without hallucinations or delusions.  (R. at 788.)  He reported drinking the prior weekend, but stated that it was the first time he drank in about six weeks.  (*Id.*)  Before that, he drank four to six drinks on the weekend.  (*Id.*)  He reported experiencing multiple stressors and described himself as having low levels of coping skills.  (R. at 789.)  Over the previous two weeks, he had experienced high levels of depressed mood, guilt, and problems with concentration, memory, and mental control, as well as moderate levels of anxiety.  (*Id.*)  Dr. Haskovec found that Plaintiff suffered from chronic pain, which had a negative impact on his qualify of life and frustrated him because it limited his ability to do things he used to do.  (R. at 798.)  Dr. Haskovec opined that Plaintiff should be considered for the proposed pain reduction procedure, finding that he had legitimate pain that had been intractable with other treatments.  (R. at 799.)

On April 4, 2013, Plaintiff saw Gary D. Gottfried, M.D.,complaining of neck pain that radiated down his right arm, as well as foot pain.  (R. at 577.)  Plaintiff informed Dr. Gottfried that he had undergone physical therapy, neck and foot surgery, and steroid and Botox injections in his neck.  (R. at 577.)  Plaintiff was pleasant, cooperative, in no acute distress, and moderately obese.  (R. at 578.)  He tended to hold his head tilted slightly to the right, and there appeared to be some atrophy of his left foot.  (*Id.*)  His cervical range of motion was moderately limited with rotation and lateral flexion movements, especially to the left, at which point he indicated some discomfort on the right side of his neck.  (*Id.*)  There was tenderness along the posterior cervical and suprascapular muscles, greater on the right, and he also had mild tenderness along the medial and lateral regions of his left foot.  (*Id.*)  No fasciculation, muscle spasms, rashes, or lesions were noted.  (*Id.*)  He had grossly intact peripheral pulses in both upper and lower extremities, and a muscle test revealed generally normal strength throughout both of his upper and lower extremities.  (*Id.*)  An electrodiagnostic study demonstrated decreased recruitment of motor units, along with small amplitude deep peroneal nerve ankle response to the left extensor digitorum brevis muscle, consistent with muscle atrophy, secondary to decreased use related to Plaintiff's fusion or possible injury in his peroneal nerve.  (*Id.*)  The study was otherwise within normal limits without evidence of cervical radiculopathy or and there was no indication of peripheral neuropathy.  (*Id.*)

On August 5, 2013, Plaintiff underwent a radiofrequency thermocoagulation in his neck.  (R. at 661-62.)  The pain in his neck improved, especially on the right side, but he still experienced pain on the left side of his neck.  (R. at 663, 666.)

On October 21, 2013, indwelling spinal cord stimulator leads were placed in Plaintiff's neck and back to help control his pain.  (R. at 681-82.)  At a follow-up on October 28, 2013, he reported

60 percent relief, and the stimulator leads were removed. (R. at 693, 695.) He received permanent stimulator leads on November 27, 2013. (R. at 580.) Following his surgery for the permanent leads, Plaintiff had follow-up appointments with Dr. Classen on December 3, 2013, December 11, 2013, and December 24, 2013. (R. at 697-709.) He reported that his pain was three out of ten, was in no apparent distress, and stated he did not have any complications after his surgery. (R. at 98, 700, 704.) He had additional follow-up appointments at the Institute on December 13, 2013, and January 10, 2014. (R. at 537-41.) He initially had pain and swelling the first week after surgery but reported feeling better after. (R. at 540.) He could not tell if there was improvement in the cervical stimulator, but the thoracic stimulator was providing coverage. (*Id.*) In January, the stimulators were providing too much coverage to additional areas. (R. at 537.)

An MRI taken on October 25, 2013, showed no evidence of fracture or dislocation, and bony alignment was normal. (R. at 777.) There was no soft tissue abnormality, but degenerative disc disease with narrowing of the disc space at C4-5 was noted. (*Id.*) Electronic stimulator wires in the spinal canal at the C2-3 level were also noted. (*Id.*)

An x-ray conducted on January 10, 2014 revealed mild degenerative disc disease at C5-C6. (R. at 574.) There was no acute fracture or dislocation, and no significant prevertebral soft tissue swelling. (*Id.*)

On March 10, 2014, Andrea Fritz, M.D., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) assessment of Plaintiff based on the medical evidence. (R. at 189-91.) Dr. Fritz opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; balance

frequently; and occasionally stoop, kneel, crouch, and crawl.  (R. at 189.)  Plaintiff was limited in

lifting left and right over the head, but was unlimited in handling, fingering, or feeling.  (R. at 190.)

Also on March 10, 2014, Robert B. White, Ph. D., an SAMC, completed a mental RFC assessment

for Plaintiff.  (R. at 191-92.)  He opined that Plaintiff was no more than moderately limited in the

areas of understanding, memory, sustained concentration, persistence, social interaction, and

adaptation.  (*Id.*)  Plaintiff could carry out, remember, and understand detailed but not complex

instructions; make decisions; attend and concentrate for extended periods; accept instructions; and

respond appropriately to changes in a routine work setting.  (R. at 192.)

        While being treated by Dr. Classen on May 1, 2014 and May 15, 2014, Plaintiff reported that

his symptoms improved due to the permanent stimulators, and most of his symptoms were relieved

with medication.  (R. at 717-24.)  He was able to increase his function and perform tasks while

taking his prescribed medication.  (R. at 717.)  He also noticed that he required less medication to

control his symptoms.  (R. at 722.)

        On May 22, 2014, he reported pain that was ten out of ten, but stated that his ear was hurting

the most because he had a basal cell carcinoma removed the day before.  (R. at 725.)  He saw Dr.

Classen for a suprascapular nerve block.  (*Id.*)  At appointments on June 3, 2014 and June 9, 2014,

he reported 60 percent overall pain relief initially, and then that his pain relief was greater than 50

percent.  (R. at 729, 733.)  Dr. Classen noted that Plaintiff still had chronic pain.  (R. at 733.)

        On May 30, 2014, Randal Reid, M.D., an SAMC, completed a physical RFC assessment of

Plaintiff based on the medical evidence.  (R. at 202-04.)  He opined that Plaintiff could lift and/or

carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 6 hours in an 8-hour

workday; sit 6 hours in an 8-hour workday; occasionally climb ramps, stairs, ladders, ropes, or

scaffolds; balance frequently; and occasionally stoop, kneel, crouch, and crawl. (R. at 202-03.) He further opined that Plaintiff was limited in lifting left and right over the head, but was unlimited in handling, fingering, or feeling. (R. at 203.) That same day, Leela Reddy, M.D., an SAMC, completed a mental RFC assessment of Plaintiff. (R. at 204-06.) She opined that Plaintiff was no more than moderately limited in the areas of understanding, memory, sustained concentration, persistence, social interaction, and adaptation. (R. at 205.) Plaintiff could carry out, remember, and understand detailed but not complex instructions; make decisions; attend and concentrate for extended periods; accept instructions; and respond appropriately to changes in a routine work setting. (R. at 206.)

On June 9, 2014, Dr. Classen performed medial branch blocks on Plaintiff's back, and he reported no pain following the procedure. (R. at 735.) The day after the procedure, he reported pain in his neck that was three out of ten on the pain scale, and he took Hydrocodone and muscle relaxers to help with the pain. (R. at 736.) On June 18, 2014, Dr. Classen performed a radiofrequency thermal coagulation of the medial branch on Plaintiff's back. (R. at 1110.) Plaintiff was in no pain upon discharge. (R. at 1111.) On September 17, 2014, Plaintiff saw Dr. Classen and reported neck and shoulder pain, and that his shoulder and neck had been feeling tight. (R. at 1099.) His pain had returned since his radiofrequency thermal coagulation, and he was having trouble sleeping because he was not able to find a comfortable position to sleep in that would not cause his shoulder or neck to hurt. (*Id.*)

Plaintiff continued to receive pain management treatment from Dr. Classen from November 11, 2014, until February 19, 2015. (R. at 1134-76.) He routinely reported neck and shoulder pain. (R. at 1134, 1140, 1145, 1149, 1154, 1159, 1164, 1173.) He also routinely reported that he was able

9

to increase function and perform tasks while taking his prescribed medication. (R. at 1134, 1149, 1154, 1159, 1164, 1169.) In November, he reported that he did not want to undergo revision surgery for his stimulators because it would cause him hand pain. (R. at 1169.) In February, he reported 70-80 percent pain relief after a stellate ganglion block was performed. (R. at 1134.)

On April 8, 2015, Dr. Siegler opined the Plaintiff's medical conditions and the large amount of medications he was taking contributed to his overall sense of fatigue and tiredness, and many of Plaintiff's conditions caused him chronic pain. (R. at 1181.) Dr. Siegler noted that Plaintiff suffered from manic depression, low testosterone, asthma, chronic neck pain, chronic foot pain, sleep apnea, gastroesophageal reflux disease, and obesity. (R. at 1181.) He further opined that Plaintiff would miss work 10 days or more per month. (R. at 1187.)

On April 9, 2015, Dr. Classen noted that Plaintiff struggled with chronic pain, but it had been reduced to a point where it became reasonably tolerable. (R. at 1190.) He still needed periodic pain block treatments and other modalities, however. (*Id.*) Dr. Classen opined that Plaintiff's impairments were chronic and persistent, and were the result of current problems with complex regional pain syndrome. (*Id.*) Although modest pain control was possible, Plaintiff would likely be unable to pursue gainful employment in the foreseeable future. (*Id.*)

On April 27, 2015, Linnie V. Rabjohn, DPM, found that Plaintiff had experienced significant pain in his left foot the previous two years. (R. at 1192.) Dr. Rabjohn noted that Plaintiff had difficulty walking even short distances or standing for any length of time and opined that Plaintiff would need a revision arthrodesis in his left foot, which was a significant surgery. (*Id.*)

Plaintiff returned to see Dr. Classen on September 22, 2015, and September 28, 2015, for more pain management treatment. (R. at 1216, 1220.) He reported that he took medication and sat

around because he was fearful of injuring himself.  (R. at 1220.)  When he injured himself, he had

to sit out for days, so he had to be more diligent of his actions.  (*Id.*)  On September 28, 2015, he

reported shoulder pain that he rated a four out of ten on the pain scale.  (R. at 1216.)  He stated that

his muscles had taut band-like spasms that restricted his range of motion.  (*Id.*)  His muscle bands

were tender to palpation, and pain was referred outward when rubbing the muscle bed.  (*Id.*)

### 3.    Hearing Testimony

On April 10, 2015, Plaintiff and a vocational expert (VE) testified at a hearing before the

ALJ.  (R. at 142-82.)  Plaintiff was represented by an attorney.  (R. at 142.)

#### a.    *Plaintiff's Testimony*

Plaintiff testified that he worked in computer network consulting in 2000, 2002, 2004, and

from 2006 to 2008.  (R. at 148-152.)  He worked full-time for Terminex in 2012 and 2013.  (R. at

148.)

Plaintiff was 52 years old, married, and had his GED.  (R. at 156.)  He was five-feet, ten-

inches tall and weighed 266 pounds.  (*Id.*)  His working weight was usually about 210 to 220

pounds, but he gained weight because he did not "get around much."  (R. at 156-57.)  His previous

jobs required him to be in the field and walking 90 percent of the time.  (R. at 157.)  He also had to

carry computer equipment from time to time.  (R. at 158.)  He was not working in 2010 because he

"was extremely bummed out."  (*Id.*)  He had quit taking his medication, "and that was a big

mistake," and he started to see a psychiatrist again.  (*Id.*)  The job with Terminex "absolutely killed

him" because it was very physical; it required climbing on the roof and underneath the house, and

his medication for pain and depression was not affecting him well.  (R. at 159.)  He also had

difficulty remembering, learning, and speaking about what he learned while with Terminex.  (R. at

159-60.)  He resigned from that job because he "was in too much pain" in his neck and shoulder. (R. at 160.)

Plaintiff stated that he underwent cervical disc fusion surgery.  (*Id.*)  Before and after surgery, he worked with Dr. Classen at the Trinity Pain Clinic.  (R. at 161.)  After his surgery, he continued to have procedures with Dr. Classen, and the procedures were ongoing at the time of the hearing.  (*Id.*)  His only other surgical procedure was for the installation of neurostimulaors to block pain signals, which consisted of placing two leads in his neck.  (R. at 162.)  The neurostimulators helped "quite a bit" but did not work for the whole day, and they also interfered with other activities because they radiated to his fingers and caused his dexterity to go away.  (R. at 162-63.)  He tried to "budget" his time on the stimulators because they interfered with his life, but he did try to use them as much as he could because they helped with his pain.  (R. at 163-64.)  He had to turn them off when he ate because they could get "really intense," and also at times in order to use the restroom and to get dressed.  (R. at 164-65.)  Dr. Classen wanted to reposition the leads.  (R. at 166.) Plaintiff still had pain in his neck and shoulder, which he described as stiffness that never went away.  (R. at 166-67.)  His neck pain also caused headaches and pain in his jaw.  (R. at 167.)

Plaintiff also testified regarding pain in his left foot and ankle.  (R. at 169.)  He had surgery about eight years before to fuse three joints in his foot.  (*Id.*)  He had pain all the time because of osteoarthritis.  (R. at 169-70.)  He also had a history of mental illness, although his diagnosis "depend[ed] on the doctor."  (R. at 170.)  His current doctor thought he was depressed, but his prior doctors were convinced he was bipolar.  (*Id.*)  All his conditions affected his energy level.  (R. at 171.)  He slept a lot even though he was never "really a big sleeper," and he had trouble controlling his emotions.  (R. at 171.)  He was being treated by a psychiatrist at Tri-City for his mental issues.

12

(R. at 172.)  He also testified that he had trouble sleeping and only slept three and a half hours the previous night.  (R. at 173.)

### b.    VE's testimony

The VE testified that Plaintiff had the following past work experience: outside sales representative, DOT 275.357-034 (SVP 5, medium); and networking sales representative, DOT 251.157-014 (SVP 7, light).

The ALJ asked the VE to consider a hypothetical individual of the same age, education, and work history as Plaintiff who could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for 4 hours out of 8 hours, with no more than 30 minutes standing at one time; sit 6 hours out of 8 hours; occasionally climb ramps or stairs; never crawl or climb ladders, ropes, or scaffolds; frequently stoop; occasionally crouch or kneel; and never balance on narrow objects such as elevated walkways; frequently reach; and understand, remember, and carry out detailed but not complex instructions.  (R. at 177-78.)  The individual could not perform tasks that required rapid movements of the head or neck, such as driving a vehicle, and the individual needed to avoid concentrated exposure to airborne irritants such as dust, fumes, or gases.  (R. at 177.)

The ALJ asked the VE if that hypothetical individual would be able to perform any of Plaintiff's past work, and the VE answered no.  (R. at 178.)  The ALJ asked if there were any transferable skills, to which the VE responded no.  (*Id.*)  The ALJ then asked for examples of light positions the hypothetical individual could perform.  (*Id.*)  The VE opined that the hypothetical person could be a counter clerk, DOT 249.366-010 (SVP 2, light), with 1,700 state jobs and 18,500 jobs nationally; rental clerk, DOT 295.357-018 (SVP 2, light), with 1,100 state jobs and 15,800 jobs nationally; or information clerk, DOT 237.367-018 (SVP 2, light), with 2,200 state jobs and 45,500

jobs nationally.  (*Id.*)

      The ALJ asked the VE to consider the same hypothetical, but to add the use of a single cane while walking, and reduce the amount of standing and walking to 2 hours out of 8 hours.  (*Id.*)  The VE testified that would reduce the work level to sedentary.  (R. at 178-79.)

      Plaintiff's attorney asked the VE how often an individual in the hypothetical classification could miss work and still maintain employment, and the VE responded one to two days per month.  (R. at 179.)  The attorney asked if an individual who would need to be in a recliner for 3-4 hours out of an 8-hour day would be able to perform any of the jobs the VE described, and the VE responded the individual would not be able to perform those jobs.  (*Id.*)  The VE stated that she did not consider any limitations beyond those identified by the ALJ in responding to the hypothetical questions.  (*Id.*)

      Plaintiff's attorney asked the VE if the hypothetical individual could do the three jobs she described if the individual could only occasionally use his hands for fingering and handling.  (R. at 179-80.)   The VE responded that the counter clerk and rental clerk jobs required only occasional handling and fingering, but the information clerk job requirement was frequent, so that job would be eliminated.  (R. at 180.)  The attorney then asked if it would eliminate the jobs if it were less than occasional, and the VE responded that it would.  (*Id.*)

## C.    <u>ALJ's Findings</u>

      The ALJ issued her decision denying benefits on February 3, 2016.  (R. at 120-36.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 13, 2012, the alleged onset date.  (R. at 122.)  At step two, the ALJ found that he had the following severe impairments: torticollis; osteoarthritis; cervical degenerative disc disease/spondylosis with radiculitis; reflex sympathetic dystrophy of the lower limb; history of fractures of the left ankle/foot;

obesity; and affective and anxiety related disorders. (R. at 122.) Despite those impairments, at step

three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or

equaled the severity of one of the impairments listed in the social security regulations. (R. at 124.)

Next, the ALJ determined that Plaintiff retained the RFC to perform the following: lift and/or

carry 20 pounds occasionally and 10 pounds frequently; sit for 6 hours out of an 8-hour workday;

stand and/or walk for 4 hours out of an 8-hour workday, with no more than 30 minutes standing at

one time; occasionally climb ramps or stairs, but never climb ladders, ropes, scaffolds, or crawl;

frequently stoop; occasionally crouch or kneel; never balance on narrow objects such as elevated

walkways; never perform tasks that require rapid movements of the head or neck such as driving a

vehicle; avoid concentrated exposure to airborne irritants like dust, fumes, and gases; frequently

reach; and understand, remember, and carry out detailed but not complex instructions. (R. at 126.)

At step four, the ALJ determined that Plaintiff was unable to perform any of his past relevant

work. (R. at 134.) At step five, the ALJ relied upon the VE's testimony to find that Plaintiff was

capable of performing work that existed in significant numbers in the national economy, including

jobs such as counter clerk, rental clerk, and information clerk. (R. at 135.) Accordingly, the ALJ

determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from

December 13, 2012, through the date of the decision. (R. at 135.)

## II.  LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a

scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id*. Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant

is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.  DRUG AND ALCOHOL ABUSE

Plaintiff's first issue for review states:

> A.    Drug and Alcohol Abuse is only material when a medical source diagnoses a substance use disorder and the claimant is found disabled when DAA is included.  Did the Administrative Law Judge fail to follow the procedural guidelines when she rejected Dr. Classen's medical opinion because she did not discuss the impact his alcohol use had on his pain?

(doc. 15 at 14.)  He further argues that the ALJ's RFC determination is not supported by substantial evidence because although the ALJ did not find him disabled, she downgraded the weight of opinion evidence "for failure to expressly address the impact of alcohol on his functioning."  (*Id*. at 15.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1).  The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386–87 (5th Cir. 1988) (per curiam).  The relevant policy interpretation regarding the RFC determination states:

> 1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.
>
> 2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. . . .

SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).

Determination of an individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.  Every medical opinion

18

is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give that opinion controlling weight. *Id.* § 404.1527(c)(2).[2]

Here, the ALJ agreed with Dr. Classen that Plaintiff had pain from his condition. (R. at 133.) She found however, that Dr. Classen's statement regarding Plaintiff's ability to pursue gainful employment was not entitled to controlling weight. (*Id.*) She then determined that the rest of Dr. Classen's opinion was not supported by the findings in the medical records because the records indicated that Plaintiff had pain relief from Botox injections and reported significant pain reduction. (*Id.*) She noted that Dr. Classen also failed to mention the "impact of [Plaintiff's] alcohol abuse and depressive symptoms, which were both noted by other treating physicians in connection with [Plaintiff's] pain." (*Id.*) Plaintiff argues that by rejecting Dr. Classen's opinion for "failure to

---

[2] If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6). The "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. . . . [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, 1994 WL 499764, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). If the evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* at 455; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981) (per curiam).

mention the impact his alcohol use had on his pain," the ALJ circumvented legal standards and violated Social Security Ruling 13-2p. (docs. 15 at 14-15; 17 at 1-2.)

Under 20 C.F.R. § 404.1535, if a claimant is found disabled, and there is medical evidence of drug addiction or alcoholism, the ALJ "must determine whether [the] drug addiction or alcoholism is a contributing factor material to the determination of disability." SSR 13-2p explains the Commissioner's policy for "consider[ing] whether 'drug addiction and alcoholism' (DAA) is material to [the] determination of disability in disability claims and continuing disability reviews." SSR 13-2p, 2013 WL 603764, at *11939. It provides in relevant part that a DAA materiality determination is made only when: (1) there is "medical evidence from an acceptable medical source establishing that a claimant has a Substance Abuse Disorder," *and* (2) the claimant is found to be "disabled considering all impairments, including the DAA." *Id*. at *11941 (emphasis added). "The regulations expressly require that a prima facie finding of disability be made by the ALJ *prior* to considering the DAA issue." *Oettinger v. Barnhart*, No. 01-CA-0801-OG-NN, 2002 WL 31422308, at *5 (W.D. Tex. Sept. 4, 2002) (emphasis in original). "In other words, DAA becomes an issue in a social security claim for benefits only after the ALJ finds the claimant disabled." *Id*. It is error for an ALJ to consider "drug and alcohol use without a finding of disability." *Pena v. Carolyn, Acting Comm'r of Soc. Sec. Admin.*, No. H-13-1486, 2014 WL 12540442, at *6 (S.D. Tex. June 12, 2014).

In *Campanile v. Astrue*, No. 10-716-JJB-CN, 2012 WL 1424728, at *3 (M.D. La. March 19, 2012), the ALJ injected information regarding the plaintiff's DAA into her determination of whether the plaintiff's impairments met or equaled a listed impairment, and "in her analysis of plaintiff's RFC determination." The ALJ noted that the plaintiff had a "serious substance abuse problem," and

tested positive for several drugs she was not prescribed. *Id.* The court noted that although a plaintiff bears the burden of proving that DAA is not a contributing factor material to the disability determination, this "burden only arises after the ALJ determines whether the claimant is disabled." *Id.* The court concluded that the ALJ erred because she "did not exclude the presence of plaintiff's drug and alcohol abuse before making her determination of plaintiff's disability status," and reversal was warranted for failure to apply the correct legal standard. *Id.* at 3–4; *see also Pena*, 2014 WL 12540442, at *4–6 (relying on *Campanile* in determining that the ALJ erred "by repeatedly referencing and relying on [the plaintiff's] drug use in determining . . . that [he] was not disabled.").

Here, as noted, the ALJ considered Dr. Classen's opinion in determining Plaintiff's RFC but found that it was not fully supported by the medical records, in part, because he did not mention Plaintiff's alcohol abuse, which was noted by other treating physicians. (R. at 133.) The ALJ appears to indicate that it was important for Dr. Classen to mention Plaintiff's alcohol abuse because she then noted that "[i]f [Plaintiff] were in fact found to be disabled with the effects of alcohol abuse considered, a second analysis without consideration of them would be required . . . ." (*Id.*) By finding that Dr. Classen's opinion was unsupported by the medical records partially because he failed to mention Plaintiff's alcohol abuse, the ALJ effectively injected information regarding Plaintiff's alcohol abuse into her determination of whether to give weight to Dr. Classen's opinion in making the RFC determination. The ALJ injected additional information regarding Plaintiff's alcohol abuse in the RFC determination when she found that Plaintiff made inconsistent statements to his doctors regarding his alcohol use, and medical records showed Plaintiff had a "history of alcohol and drug abuse." (R. at 132-33.) Further, the ALJ noted that she "considered the effects of [Plaintiff's] symptoms related to his physical and mental impairment, which [were] present

regardless of [his] alcohol and drug abuse," and found that his "alcohol and drug abuse [were] not contributing factors material to the determination of disability." (R. at 133-34.) Because the ALJ considered Plaintiff's alcohol abuse in his RFC determination, and rejected part of Dr. Classen's opinion for failure to mention the impact of his alcohol abuse without first making a determination as to whether he was disabled, the ALJ did not apply the correct legal standard and therefore erred. *See Pena*, 2014 WL 12540442, at *6 (citing *Campanile*, 2012 WL 1424728, at *3–4).

"While there may be sufficient evidence in the record to support the ALJ's finding that plaintiff is not disabled, the Court must also determine if the ALJ applied the proper legal standards in making that decision. No deference is afforded the Commissioner's legal determinations; review of legal issues is *de novo*." *Campanile*, 2012 WL 1424728, at *4 (citing *Harris v. Apfel*, 209 F.3d 413, 418 (5th Cir. 2000)); *see also Pena*, 2014 WL 12540442, at *6. Generally, appeals from administrative agencies of a procedural error will not lead to a vacated judgment "unless the substantial rights of a party have been affected." *Anderson v. Sullivan,* 887 F.2d 630, 634 (5th Cir.1989) (per curiam) (quoting *Mays v. Bowen,* 837 F.2d 1362, 1364 (5th Cir.1988) (per curiam)). However, a failure to apply the correct standard is a legal error, not a procedural error. The Fifth Circuit has left the lower courts no discretion to determine whether this type of an error was harmless. It has mandated that when the Commissioner "has relied on erroneous legal standards in assessing the evidence, he must reconsider that denial." *Moore v. Sullivan,* 895 F.2d 1065, 1070 (5th Cir. 1990) (quoting *Leidler v. Sullivan,* 885 F.2d 291, 294 (5th Cir. 1989)). In light of the ALJ's legal error, this case should be remanded with directions to the ALJ to apply the correct legal standard.[3]

---

[3] Because remand is warranted on this issue, the Court does not reach Plaintiff's second issue.

## IV.  RECOMMENDATION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED**

to the Commissioner for further proceedings.

**SO RECOMMENDED**, on this **6th** day of April, 2018.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

23